## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| TERRY WHITE and CHRIS PERKINS, Derivatively on Behalf of Nominal Defendant DYCOM INDUSTRIES, INC.,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>STEVEN E. NIELSEN, H. ANDREW DEFERRARI, DWIGHT B. DUKE, EITAN GERTEL, ANDERS GUSTAFSSON, PATRICIA L. HIGGINS, RICHARD K. SYKES, LAURIE J. THOMSEN, CHARLES B. COE, and STEPHEN C. COLEY,<br><br>　　　　　　Defendants,<br><br>　and<br><br>DYCOM INDUSTRIES, INC.,<br><br>　　　　　　Nominal Defendant. | Case No.<br><br>**<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>** |

Plaintiff Terry White and Chris Perkins ("Plaintiffs"), by and through their undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Dycom Industries, Inc. ("Dycom" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Dycom with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports,

analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.   NATURE AND SUMMARY OF THE ACTION

1.      Dycom provides specialty contracting services, include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, and other construction and maintenance services for electric and gas utilities.

2.      In November 2017, the Company reported positive financial results for the first quarter 2018, including gross margins of 20.55% of revenue, "reflecting solid operating performance." Dycom's management stated that, although the Company would experience normal timing volatility, there was not "anything unusual" affecting the large projects.

3.      However, on May 22, 2018, Dycom reported disappointing financial results lowered its fiscal 2019 guidance. The Company's Chief Financial Officer ("CFO") attributed the margin pressure to "under-absorption of labor and field costs as large customer programs mobilized." The Company's Chief Executive Officer ("CEO") also attributed the poor results to uncertainties with permitting for larger projects.

4.      On this news, Dycom's stock price fell $23.56, or over 20%, to close at $92.64 per share on May 22, 2018, on unusually heavy trading volume.

5.      On August 13, 2018, before the market opened, Dycom announced preliminary revenue for second quarter 2019, which fell below previous guidance. Dycom's CEO attributed the results to "large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level.

6. On this news, Dycom's stock price fell $21.62 per share, or over 24%, to close at $68.09 per share on August 13, 2018, on unusually heavy trading volume.

7. These revelations precipitated the filing of a securities class action in the United States District Court for the Southern District of Florida against Dycom and certain of its officers, captioned *Tung v. Dycom Industries, Inc., et al.*, Case No. 9:18-cv-81448-AHS (the "Securities Class Action").

8. On April 14, 2020, U.S. District Judge Raag Singhal issued an order in the Securities Class Action denying defendants' motion to dismiss. In the order, Judge Singhal held that a claim for securities fraud had been stated against Dycom and certain of its officers. On May 5, 2020, the parties to the Securities Class Action announced they had reached a settlement in principle. It is now a virtual certainty that Dycom will incur significant liability due to the fiduciary breaches committed by defendants when they issued misleading statements about the large scale projects.

9. Plaintiffs did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of eight members, seven of whom are named in this action. As alleged herein, Nielsen as Chief Executive Officer knowingly issued misleading statements, and his motion to dismiss the Securities Class Action was denied. Moreover, Gertel, Higgins, and Thomsen, as members of the Audit Committee, knew that the uncertainties with permitting would impact Dycom's financial results yet allowed misleading statements to be disseminated. Additionally, Duke and Thomsen awarded compensation to themselves and officers who made and/or allowed materially misleading statements to be disseminated in Dycom's SEC

filings and other disclosures.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.   JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiffs**

12.    Plaintiff Terry White purchased Dycom stock in August 2017 and has continuously owned his Dycom stock since that date.

13.    Plaintiff Chris Perkins purchased Dycom stock in October 2016 and has continuously held his Dycom stock since that date.

**Nominal Defendant**

14.    Nominal Defendant Dycom is a Florida corporation with its principal executive offices located at 11780 US Highway 1, Suite 600, Palm Beach Gardens, FL 33408.  The Company stock trades on the New York Stock Exchange ("NYSE") under the symbol "DY."

**Defendants**

15.     Defendant Steven E. Nielsen ("Nielsen") has served as the Company's President and Chief Executive Officer since March 1999 and as a director since 1996.  At all relevant times, Nielsen was Chair of the Executive committee.  Nielsen is a defendant in the Securities Class Action.

16.     Defendant H. Andrew DeFerrari ("DeFerrari") has served as the Company's Chief Financial Officer and Senior Vice President since April 2008.  DeFerrari is a defendant in the Securities Class Action.

17.     Defendant Dwight B. Duke ("Duke") has served as a director of the Company since 2011.  At all relevant times, Duke served as Chair of the Compensation committee and a member of the Corporate Governance committee.

18.     Defendant Eitan Gertel ("Gertel") has served as a director of the Company since 2016.  During fiscal 2017, Gertel served as a member of the Corporate Governance and Finance committees.  Since the Transition Period, Gertel has served as a member of the Audit committee, in addition to serving as a member of the Corporate Governance and Finance committees.

19.     Defendant Anders Gustafsson ("Gustafsson") has served as a director of the Company since 2013.  At all relevant times, Gustafsson served as a member of the Corporate Governance, Executive, and Finance committees.

20.     Defendant Patricia L. Higgins ("Higgins") has served as a director of the Company since 2008.  At all relevant times, Higgins served as Chair of the Audit committee and member of the Corporate Governance and Finance committees.

21.     Defendant Richard K. Sykes ("Sykes") has served as a director of the Company since March 2018.

22.     Defendant Laurie J. Thomsen ("Thomsen") has served as a director of the Company since 2015.  Since the Transition Period, Thomsen has served as Chair of the Finance committee, in addition to serving as a member of the Audit and Compensation committees.

23.     Defendant Charles B. Coe ("Coe") served as a director of the Company from 2005 to November 21, 2017.  During fiscal 2017, Coe served as Chair of the Finance committee and member of the Audit and Compensation committees.

24.     Defendant Stephen C. Coley ("Coley") served as a director of the Company from 2003 to January 2020.

25.     The defendants named in ¶¶ 14-23 are sometimes referred to hereinafter as the "Individual Defendants."  The defendants named in ¶¶ 14, 16-23 are sometimes referred to hereinafter as the "Director Defendants."

26.     Peter T. Pruitt, Jr. has served as a director of the Company since November 19, 2018.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors, and/or fiduciaries of Dycom and because of their ability to control the business and corporate affairs of Dycom, at all relevant times, the Individual Defendants owed Dycom and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Dycom in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Dycom and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Dycom and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dycom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Dycom, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of Dycom were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Dycom were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Company Overview

30.     Dycom provides specialty contracting services, include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, and other construction and maintenance services for electric and gas utilities.

31.    In September 2017, Dycom announced a change in the Company's fiscal year end from July to January.  Beginning with a six month transitional period from July 30, 2017 to January 27, 2018 (the "Transition Period"), the Company's fiscal period will end on the last Saturday of January.  Thus, Dycom's 2019 fiscal year commenced January 28, 2018.

### B.    The Individual Defendants Issue False and Misleading Statements

32.    On November 20, 2017, the Individual Defendants caused Dycom to issue a press release announcing the Company's first quarter 2018 financial results for the period ended October 28, 2017.  The press release stated, in relevant part:

> PALM BEACH GARDENS, Fla., Nov. 20, 2017 /PRNewswire/ -- Dycom Industries, Inc. (NYSE: DY) announced today its results for the fiscal quarter ended October 28, 2017. This announcement is one day earlier than previously scheduled and the conference call to review the Company's results is now scheduled for Monday, November 20, 2017 at 9:00 a.m. (ET). Specific dial-in and replay information appears below.
>
> The schedule change is a result of the Company's preliminary determination that certain documents containing financial information were subject to unauthorized access after the market closed on Friday, November 17, 2017. The Company's investigation is ongoing and law enforcement authorities have been notified.
>
> - Contract revenues of $756.2 million for the quarter ended October 28, 2017, compared to $799.2 million for the quarter ended October 29, 2016. Contract revenues for the quarter ended October 28, 2017 decreased 8.4% on an organic basis after excluding $8.6 million of contract revenues from an acquired business that was not owned during the prior year quarter and $15.5 million of contract revenues from storm restoration services in the current period.
>
> - Non-GAAP Adjusted EBITDA of $97.6 million, or 12.9% of contract revenues, for the quarter ended October 28, 2017, compared to $129.2 million, or 16.2% of contract revenues, for the quarter ended October 29, 2016.
>
> - On a GAAP basis, net income was $28.8 million, or $0.90 per common share diluted, for the quarter ended October 28, 2017, compared to net income of $51.0 million, or $1.59 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income was $31.6 million, or $0.99 per common share diluted, for the quarter ended October 28, 2017, compared to Non-GAAP Adjusted Net Income of $53.7 million, or $1.67 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income for the quarters ended October 28, 2017 and

October 29, 2016 excludes $4.5 million and $4.3 million, respectively, of pre-tax interest expense incurred for non-cash amortization of the debt discount associated with the Company's 0.75% convertible senior notes due September 2021.

Net income and Non-GAAP Adjusted Net Income for the quarter ended October 28, 2017 include an income tax benefit of approximately $0.9 million for the tax effects of certain share-based award activities as a result of the Company's adoption of Accounting Standards Update No. 2016-09, *Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* ("ASU 2016-09"). This tax benefit would have been recorded to additional paid-in-capital under the previous accounting standard.

The Company also announced its outlook for the fiscal quarter ending January 27, 2018. The Company currently expects total contract revenues for the fiscal quarter ending January 27, 2018 to range from $645 million to $675 million. On a GAAP basis, diluted earnings per common share for the fiscal quarter ending January 27, 2018 is expected to range from $0.15 to $0.27. Non-GAAP Adjusted Diluted Earnings per Common Share is expected to range from $0.24 to $0.36. Non-GAAP Adjusted Diluted Earnings per Common Share guidance excludes $4.6 million of pre-tax interest expense for non-cash amortization of debt discount, or $0.09 per common share diluted on an after-tax basis. A reconciliation of Non-GAAP Adjusted Diluted Earnings per Common Share guidance provided for the fiscal quarter ending January 27, 2018, along with reconciliations of other Non-GAAP measures, is included within the press release tables.

33.    The same day, the Company held a conference call to discuss the financial results.

During the call, defendant Nielsen stated, in relevant part[1]:

Revenue was $756.2 million, a decrease of 5.4%. Organic revenue, excluding $15.5 million of storm restoration services in the quarter declined 8.4%. This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks and grew core market share, offset by near-term moderation by a large customer. Gross margins were 20.55% of revenue, reflecting solid operating performance, offset by the impacts of the decline in revenue. General and administrative expenses were 8.54%.

\* \* \*

***Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis.***

---

[1] Unless otherwise stated, all emphasis is added.

Our ability to provide integrated planning, engineering and design, procurement and construction and maintenance services is of particular value to several industry participants.

34.    Defendant Nielsen also stated that "As with prior initiations of large-scale network deployments, [the Company] expect[ed] some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting impact timing."

35.    During the same call, analysts wanted to clarify whether the permitting holdups reflected the scale of these capital plans or whether "there [is] something else specific going on." Defendant Nielsen assured that it wasn't "anything unusual."  He stated, in relevant part:

> [W]hen you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. ***It is not anything unusual, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting.*** And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring. So I think it'll get better, it always does. But at this stage in these projects, it's always something to watch.

36.    During the same call, defendant Nielsen reported an increase in the headcount to 14,393, from 13,236 for the fiscal quarter ended January 28, 2017.  Analysts noted that the employee count was "surprising" and confirmed whether "that's just part of the absorption comments that [the Company] feels very comfortable hiring more heads, given the line of sight [it] see[s] coming down the pike."  During the Q&A session of the call, an analyst asked about the reasons for this headcount increase. In this exchange, each party stated in relevant part:

> [W]ith respect to the employee count, as we've talked about on the last call, we certainly are adding engineers, planners, designers, project managers. We're setting up warehouse locations to support these new project initiations. And the core business, is busy. I mean you look at the housing numbers, there are other things

that are driving that headcount, but we're getting ready. Well, we're not getting ready, we're doing the engineering work we need to get started.

37.    Regarding the impact of the new large projects, defendant DeFerrari stated that "gross margin percentage [was expected] to be in line or slightly better compared to the April 2017 quarterly margin, reflecting the expected mix of work activity and improving performance as services for large customer programs begin to accelerate."  When asked how management was confident that "gross margins will get back to flat, given the fact there will still be early in some of these large programs," defendant Nielsen responded, in relevant part:

> So Adam, if you remember, Drew's comments and Drew can amplify on this, are talking about absorption, right? ***We are incurring some costs in the January quarter that we think we get the benefit of as revenue returns, at least in line and possibly growth.***

38.    On this news, Dycom's stock price increased $12.82, over 14%, over three consecutive trading sessions to close at $102.86 per share on November 22, 2017.

39.    The statements referenced in ¶¶ 31-36 were materially misleading because they failed to disclose that: (i) Dycom's large projects were highly dependent on permitting and tactical considerations; (ii) Dycom faced significant uncertainties related to permitting issues; (iii) these uncertainties posed near-term margin pressure and absorption issues for Dycom; and (iv) as a result of the foregoing, Defendants' statements about Dycom's business, operations, and prospects, were misleading and/or lacked a reasonable basis.

**C.    The Truth Begins to Emerge**

40.    On May 22, 2018, Dycom announced its first quarter 2019 financial results for the period ended April 28, 2018 and revised its the guidance for fiscal 2019.  The Company stated, in relevant part:

**Outlook**

The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018 and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins. The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

| | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 |
|---|---|---|
| Contract revenues | $3.30 - $3.50 billion | $3.23 - $3.43 billion |
| Diluted Earnings per Common Share - GAAP | $4.78 - $5.70 | $3.81 - $4.70 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $5.22 - $6.14 | $4.26 - $5.15 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 12.4% - 12.9% |

*For a reconciliation of the prior Fiscal 2019 Diluted Earnings per Common Share guidance to the prior Non-GAAP Adjusted Diluted Earnings per Common Share guidance and a reconciliation of the prior Fiscal 2019 Net income guidance to the prior Non-GAAP Adjusted

41.     The same day, the Company held a conference call to discuss the financial results.

During the call, defendant DeFerrari, stated in relevant part:

Adjusted EBITDA was $73.7 million in Q1 2019, which was at 10.1% of revenue. Gross margins were at 18% and compared to the April quarter last year were impacted by prolonged winter weather conditions and costs incurred on large customer programs.

Gross margins were approximately 100 basis points below our expectations for the quarter. ***This margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized. We expect margins to continue to be impacted in the near term with the pressure dissipating as we gain greater momentum on these large programs.*** Accordingly, our outlook has been lowered for the full fiscal year from our prior expectations to reflect the expected margin pressure.

42.     Analysts were focused on the disappointing margins, as one stated "***the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it.***"  Defendant Nielsen stated, in relevant part:

So, to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. With respect to the pressure on the business, we have a number of large programs, some of which require extensive permitting and other governmental authorities. While we've been through this before, the timing of when you build up a cadence in that process that will allow you to efficiently deploy resources, it's hard to forecast. I mean, we understand that and we're disappointed that we didn't get it as right as we would have liked last quarter. But that doesn't

12

change that the projects are there, that we're confident in our ability to execute. ***We've just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management as well as be efficient in the field as we get more permitted backlog that we can really go to work on.*** And it's getting better every day. It's just not getting better as quickly as we would have hoped 91 days ago.

43.     An analyst clarified: "is this customer shifting the timing of work or is it simply the permitting process?"  Defendant Nielsen responded

We're all working together with our customers, with the permitting authorities. These are large programs. In fact, I think they are substantial programs and that means there is a substantial buildup in activities from the permitting authorities and it's taking a little time, but it's getting better.

44.     During the call, defendant Nielsen further disclosed full knowledge of these uncertainties and its impact on permitting issues because they were "always around starting the process."  Nielsen added that the Company "had similar experiences with large programs 15 years ago" and was "still at them."

45.     On this news, Dycom's stock price fell $23.56, or over 20%, to close at $92.64 per share on May 22, 2018, on unusually heavy trading volume.

46.     On August 13, 2018, before the market opened, Dycom announced preliminary revenue and results for second quarter 2019, which fell below previous guidance.  During a conference call that day, defendant Nielsen elaborated:

This morning, we reported preliminary results for the second quarter that were below our prior expectations. Revenue is expected to be approximately $799.5 million with Adjusted Diluted Earnings per Share, expected to range from a $1.05 to $1.08. This range includes approximately $0.9 million of incremental tax benefits. ***These preliminary results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level.***

(Emphasis added.)

47.    Defendant Nielsen disclosed that Dycom's core business was not as busy as previously reported and that large projects were not ramping up as expected due to uncertainties related to permitting issues.  Specifically, during the call, analysts questioned the permitting:

> **Analyst:** Steve, your comment with regards to tactical considerations primarily permitting, can you expand upon that just a little bit as it relates to how this tactical consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?
>
> **Nielsen:** Yeah, I think Alex as we said in May, these are big programs, they're ramping up broadly, ***they're subject to greater uncertainties and those are the uncertainties that impacted the second quarter.*** I mean they will resolve, but there are uncertainties because of the size of the programs.
>
> **Analyst**: And then as it relates to cost pressures in the short-term, can you expand upon that a little bit too? And maybe address sort of your thinking on head count in the short-term, do you carry head count in anticipation of the big backlog and how that could come through next year? Just a little bit more detail would be helpful?
>
> **Nielsen:** Sure. So, I think as we said in the comments, it's really an absorption question. I mean ***we have to have the staff in place to support the revenue that's embedded in the guidance and we do, but we're not as busy as we had expected to be and so that created an absorption question.*** But because the work is there we have to have the people.

(Emphasis added.)

48.    On this news, Dycom's stock price fell $21.62 per share, or over 24%, to close at $68.09 per share on August 13, 2018, on unusually heavy trading volume.

**D.    The Director Defendants Issued a Materially Misleading Proxy Statement**

49.    On October 12, 2017, defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held November 21, 2017.  In the proxy statement, these eight Director Defendants solicited stockholder votes in favor of six management proposals, including: (i) a proposal to elect Duke and Thomsen to new terms as directors; (ii) a proposal to approve an amendment to the 2012 Long-Term Incentive Plan (the "2012 Plan"); and (iii) a

proposal to approve the Company's 2017 Non-Employee Directors Equity Plan (the "2017 Directors Plan").

50.     The proxy statement disclosed that the Board had determined that defendant Nielsen was not independent.  Regarding corporate governance and risk oversight, the proxy statement stated:

> The Board of Directors takes an active role in overseeing risks related to the Company both as the full Board of Directors and through its committees. The committees of the Board of Directors are primarily responsible for the oversight of risk as follows:
>
> - the Audit Committee has oversight over the financial reporting, accounting and internal control risks;
>
> - the Compensation Committee oversees the Company's executive compensation arrangements, including the identification and management of risks that may arise from the Company's compensation policies and practices (see page 25 of this Proxy Statement for a more detailed discussion);
>
> - the Corporate Governance Committee has oversight over corporate governance, including establishing practices and procedures that promote good governance and mitigate governance risk, and is also responsible for reviewing the performance of the Board of Directors and individual directors. The Corporate Governance Committee also ensures that each committee of the Board of Directors engages in an annual performance self-evaluation based upon criteria and processes established by the Corporate Governance Committee; and
>
> - the Finance Committee has oversight over liquidity, credit and interest rate risks, and acquisition and disposition plans.

51.     Regarding officer compensation, the proxy statement told stockholders that Nielsen received $4,383,269 and DeFerrari received $1,670,118 in executive compensation for fiscal 2017.

52.     In addition to this executive compensation, the 2012 Plan authorizes the issuance of shares of Dycom's stock for equity awards to employees and officers.  As of October 2, 2017, 434,921 shares were available for future grant.  The proxy statement solicited shareholder approval

to increase the number of shares available for issuance under the 2012 Plan by 865,000. If approved, the total number of shares reserved for issuance would be 1,299,921.

53.     Regarding non-employee director compensation, the proxy statement told stockholders that each of Coe, Coley, Duke, Gertel, Gustafsson, Higgins, and Thomsen received compensation from Dycom for their service on the Board during fiscal 2017 ranging between $199,038 and $229,285.   In addition to this excessive compensation, the 2007 Non-Employee Directors Equity Plan (the "2007 Plan") authorizes the issuance of shares of the Company's common stock to Dycom's non-employee directors.   As of October 2, 2017, 112,576 shares were available for future grant.   The 2007 Plan was scheduled to expire on November 20, 2017 in accordance with its terms.

54.     The proxy statement solicited shareholder approval of the 2017 Directors Plan to replace the 2007 Plan.   According to the proxy statement, the 2017 Directors Plan is administered by the Board or a committee of non-employee directors.   If approved, the total number of shares reserved for issuance under the 2017 Directors Plan would be 140,000. Moreover, equity pursuant to the 2017 Directors Plan is effectively awarded at the discretion of the Board:

> ***Administration.*** The 2017 Directors Plan is administered by the Board of Directors or any committee designated by the Board of Directors (for purposes of this proposal, the Board of Directors or such committee being referred to herein as the "Administrator"). Subject to the terms of the 2017 Directors Plan, the Administrator will have discretionary authority to determine the terms and conditions of awards made under the 2017 Directors Plan. Additionally, the Administrator may, without limitation, make factual and legal determinations in connection with the administration or interpretation of the 2017 Directors Plan. All decisions and determinations by the Administrator are final and binding on all parties.

55.     The proxy statement as materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of

discretionary compensation.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

56.    On November 22, 2017, the Company filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement.  In particular: (i) defendants Duke and Thomsen were reelected to terms as directors; (ii) the amendment to the 2012 Plan was approved; and (iii) the 2017 Directors Plan was approved.  The reelection of these two directors and approval of the 2012 Plan and the 2017 Directors Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties.

## VI.    DAMAGES TO THE COMPANY

57.    As a direct and proximate result of the Individual Defendants' conduct, Dycom has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)    Legal fees incurred in connection with the Securities Class Action;

b)    Funds paid to settle the Securities Class Action; and

c)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Dycom.

58.    In addition, Dycom's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

59.    The actions complained of herein have irreparably damaged Dycom's corporate image and goodwill.  For at least the foreseeable future, Dycom will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Dycom's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.    Plaintiffs bring this action derivatively in the right and for the benefit of Dycom to redress injuries suffered, and to be suffered, by Dycom as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violations of Sections 10(b) and 14(a) of the Exchange Act.  Dycom is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

61.    Plaintiffs will adequately and fairly represent the interests of Dycom in enforcing and prosecuting its rights.

62.    Plaintiffs have continuously been shareholders of Dycom at times relevant to the wrongdoing complained of and are current Dycom shareholders.

63.    When this action was filed, Dycom's Board of Directors consisted of defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Sykes, and Thomsen and non-party director Pruitt. Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Nielsen**

64.    At all relevant times, Nielsen was the Company's CEO, and therefore was not independent under NYSE listing rules.  As an employee, Nielsen derives substantially all of his income from his employment with Dycom, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO and as alleged herein, Nielsen knew that uncertainties with permitting posed near-term margin pressure and absorption issues for Dycom. Nielsen personally issued the misleading statements

alleged herein.  Due to his statements, Nielsen is a defendant in the Securities Class Action and his motion to dismiss the securities fraud claims against him was denied.  As a result, Nielsen would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

**Defendants Gertel, Higgins, and Thomsen**

65.     Gertel, Higgins, and Thomsen served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, Gertel, Higgins, and Thomsen failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Dycom's SEC filings and other disclosures.  Thus, Gertel, Higgins, and Thomsen breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Duke and Thomsen**

66.     Duke and Thomsen served as members of the Compensation Committee at all relevant times.  As such, they are responsible for reviewing and approving executive compensation.  As alleged herein, Duke and Thomsen compensated themselves and directors and officers who breached their fiduciary duties by allowing materially misleading statements to be disseminated in Dycom's SEC filings and other disclosures.  Thus, Duke and Thomsen breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Nielsen, Duke, Gertel, Gustafsson, Higgins, and Thomsen**

67.     Further, Nielsen, Duke, Gertel, Gustafsson, Higgins, and Thomsen could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in October 2017.  These six directors issued the proxy statement knowing that representations made in the Company's SEC filings and other disclosures were misleading with

respect to the permitting issues, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in November 2017. Had these four directors truthfully and completely revealed the misleading nature of the Company's public statements, Duke and Thomsen would not have been reelected as directors and the 2012 Plan and 2017 Directors' Plan would not have been approved. As a result, Nielsen, Duke, Gertel, Gustafsson, Higgins, and Thomsen would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

68.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Dycom's business and affairs, particularly with respect to issues as fundamental as public disclosures.

70.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Dycom.

71.     In breach of their fiduciary duties owed to Dycom, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

72.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

73.      As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Dycom has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

74.      Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.      By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Dycom.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Dycom.

76.      Plaintiffs, as stockholders and representatives of Dycom, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

77.      Plaintiffs, on behalf of Dycom, have no adequate remedy at law.

## COUNT III

### (Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Individual Defendants)

78.      Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     This Count is asserted on behalf of the Company against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

80.     Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the misleading disclosures, which were intended to, and did deceive the Company that: (i) Dycom's large projects were highly dependent on permitting and tactical considerations; (ii) Dycom faced significant uncertainties related to permitting issues; (iii) these uncertainties posed near-term margin pressure and absorption issues for Dycom; and (iv) as a result of the foregoing, Defendants' statements about Dycom's business, operations, and prospects, were misleading and/or lacked a reasonable basis.

81.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that he (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

82.     As  alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced  in  the  issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Dycom, their control over, and/or receipt and/or modification of Dycom's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Dycom, participated in the fraudulent scheme alleged herein.

83.     As a result of Defendants' misconduct, Dycom the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

84.     Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

### COUNT IV

**Violations of Section 14 of the Securities Exchange Act of 1934**
**Against Defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley**

85.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

86.     Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein

not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's proxy statement filed on October 12, 2017 violated § 14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

87. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

88. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited and obtained shareholder votes for: (i) director nominees; (iii) ratification of the appointment of the Company's independent auditor; (iii) executive compensation; (iv) frequency of votes on executive compensation; (v) amendment and restatement of the Company's 2012 Long-Term Incentive Plan; and (vi) approval of the 2017 Non-Employee Directors Equity Plan. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

89. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of Dycom, demand judgment as follows:

A. Declaring that plaintiffs may maintain this action on behalf of Dycom and that plaintiffs are adequate representatives of the Company;

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Dycom;

D.      Directing Dycom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dycom and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Dycom's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Dycom to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Dycom have an effective remedy;

F.      Awarding to Dycom restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.  Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury.

Dated: May 8, 2020

By: /s/ Scott D. Egleston
Scott D. Egleston
152 N.E.167th Street, Suite 300
Miami, Florida 33162
Telephone: (305) 892-8088
Facsimile: (305) 675-3730
E-mail: scott@eglestonlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Counsel for Plaintiffs Terry White and Chris Perkins*

## <u>VERIFICATION</u>

I, Chris Perkins, do hereby verify that I am a holder of common stock of Dycom Industries, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/5/2020

DocuSigned by:

7DCDA13C35634FD...

Chris Perkins

## <u>VERIFICATION</u>

I, Terry White, do hereby verify that I am a holder of common stock of Dycom Industries, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/5/2020

DocuSigned by:

*Terry White*

7187F91E485F462...

Terry White